Filed 3/12/21  P. v. Rodriguez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C090984 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE020696) |
| v. | |
| MANUEL SANTACRUZ RODRIGUEZ, | |
| Defendant and Appellant. | |

A jury found defendant Manuel Santacruz Rodriguez guilty of two counts of robbery and found true personal use of a firearm allegations as to each count.  Defendant testified in his own defense at trial, and now contends his trial counsel rendered ineffective assistance by eliciting incriminating evidence on direct examination.  We conclude defendant has failed to establish ineffective assistance of counsel and will affirm the judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

Defendant, along with two codefendants, robbed two stores. In each robbery, defendant entered a store pretending to be a customer. Once he began interacting with a store employee, he would produce a gun and take money or items.[1]

At trial, defendant admitted committing the robberies, but claimed he had only used a BB gun, rather than a real firearm. The prosecution called R.G., an employee at the first store defendant robbed. He testified defendant pointed a gun at him from about two feet away and that he had a "good look" at the gun. R.G. believed the gun was a Beretta nine-millimeter based on the shape of the gun's face and barrel; he knew the gun was not a BB gun because its barrel was wider than a BB gun barrel.

R.G. testified he did not own any firearms. He had, however, served in the Air Force for six years and had qualified to use Berettas in that time. As part of that qualification, he fired, disassembled, and cleaned Berettas. He had observed Beretta barrels from multiple angles and testified his experiences with firearm safety caused him to pay close attention to the barrel of defendant's gun. After defendant left the store, R.G. called 911 and identified the make and model of the gun to the dispatcher.[2]

R.R., an employee at the second store defendant robbed, testified he was able to look at defendant's gun, but did not remember anything about the gun. On cross-examination, defense counsel showed R.R. a BB gun and asked R.R. if it looked like the gun defendant had used in the robbery, and R.R. replied he did not know. R.R. stated he did not want to "get shot and then verify whether he has a gun or not."

Detective Brant Santin, who investigated the crime, testified that a BB gun barrel is smaller than a nine-millimeter barrel. A nine-millimeter barrel would be

---

[1] Surveillance video footage of both robberies was entered into evidence and viewed by the jury.

[2] A recording of the 911 call was played for the jury at trial.

approximately the size of a pinky finger, while a BB gun barrel would be the size of a ball bearing.

The defense introduced two BB guns resembling real guns. Although the two BB guns had been purchased shortly before trial, testimony established the guns had been available for sale at the time of the crime in a local Walmart.

Defendant testified in his own defense. Defendant testified he first started using methamphetamine in 2018. He explained that shortly before the robberies, he had been fired from his job and bought methamphetamine from a "homeless gentleman." He bought a BB gun resembling a Beretta nine-millimeter at Walmart because he was worried he might be robbed while buying drugs.

He ran into one of the codefendants at a gas station and asked her if she knew where to get drugs. She took him to a hotel, where he met his other codefendant and a pimp. While there, they received a call from the hotel telling them they had to pay their hotel bill. Defendant told them he wanted drugs, and they suggested he help them commit a robbery to pay for the hotel bill. He stated he used a BB gun in the robbery because it looked like a real gun, but would not hurt anybody, and he would not "get charged for the real gun."

After the first robbery, they went back to the hotel and defendant waited for two hours, but did not get the drugs he had been promised. Defendant left the hotel, but noticed the BB gun he had just used was missing. He then went back to Walmart and purchased a second BB gun. He testified that he also bought the second BB gun to protect himself while buying drugs. He returned to the homeless encampment where he had previously bought drugs, but could not find anybody.

He then returned to the hotel and asked the three others for help. Once again, the hotel called them and told them the hotel bill was due, so the three asked defendant to help rob another store. Defendant used the second BB gun to rob the store. Defendant returned to the hotel, then again left without getting any drugs. Defendant drove to

3

Portland and disposed of the BB gun on the way there. He spent 30 days in Oregon, then went to Nebraska, where he was arrested.

Towards the end of his direct examination, defense counsel asked defendant:

"Q      Let's talk about some of your background. [¶]  Have you ever been arrested before?

"A      Yes.

"Q      What have you been arrested for?

"A      Just misdemeanor stuff, possession of marijuana or driving without a license. And one time, I got a child neglect charge cause I had marijuana in my house.

"Q      Was the child home at the time?

"A      No, she wasn't.

"Q      So, you picked up those, those were all misdemeanors and that was back in Nebraska?

"A      Yes."

The parties then had a discussion outside the presence of the jury. The prosecution informed the court defendant also had three felony arrests:  two from 2015 for possession of a controlled substance and sexual assault, and one from 2018 for possession of a controlled substance. The prosecutor stated she had not intended to discuss defendant's criminal history, but that his response had opened the door to impeachment using the felony arrests.

Defense counsel responded:  "Yes, I definitely did use the word 'arrests' and almost had to concede that I did move it over because it was based off my client's direct response that he had only been arrested for those, I believe three items -- three offenses. [¶]  He could have mentioned the felony -- the two felony charges. What I'd ask is -- I have to kind of put out there that the sexual one seems to be a 352 issue, even though the door was open. The felony arrest for felony possession, that one I have to concede it was fair game. [¶]  He can explain that he was not convicted of a felony but arrest[ed] for it.

4

He can explain that to the jury that what he meant was what I was convicted for even though I used the word 'arrest'. [¶] I would ask that the sexual assault matter still not be allowed to be mentioned under the 352 analysis." The court allowed the prosecution to raise the three arrests, provided the sexual assault arrest was sanitized.

When the prosecutor asked defendant about his felony arrests, he clarified, "When I answered that, I misunderstood. I thought you meant -- when you said arrest, to me arrest means convictions. I'm not a lawyer, so I'm not up to lingo with the terms. [¶] But when you get arrested for something and they let you go because it's false, I don't assume you get arrested for that. I didn't know that stays on your record. I was wrongfully arrested for three things and those were all dismissed." He admitted two felony arrests from 2015 and one felony arrest from 2018. He explained that all three of the charges had been dismissed or reduced to misdemeanors and clarified that he had only been convicted of misdemeanors. The prosecutor did not ask defendant about the nature of the charges for each arrest or the underlying details of the charged crimes.

On rebuttal, the prosecution introduced two phone calls defendant had made from jail to his then-fiancée. In one of the calls, defendant mentions a senate bill related to firearm laws. In neither call did defendant claim he was only using a BB gun during the robberies.

During closing arguments, the prosecutor emphasized witness credibility, arguing defendant was the only witness "who had a motive to lie out of every witness that we heard from." She did not mention defendant's felony arrests.

The jury found defendant guilty of two robbery counts (Pen. Code, § 211) and found true the allegations defendant personally used a firearm in the commission of both crimes (Pen. Code, § 12022.53, subd. (b)).

## DISCUSSION

Defendant argues he received ineffective assistance of counsel because defense counsel introduced damaging testimony about his arrest record and opened the door to

cross-examination on that record. The arrest record, defendant argues, damaged his credibility and its introduction was thus prejudicial. We disagree.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [104 S.Ct. 2052] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218 (*Ledesma*).) A reviewing court may reject a claim of ineffective assistance of counsel without addressing both components if a defendant makes an insufficient showing as to either prong. (*Strickland*, at p. 697.)

To show prejudice, defendant must show a reasonable probability of a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) "The likelihood of a different result must be substantial"—showing the errors had some conceivable effect on the outcome is insufficient. (*Harrington v. Richter* (2011) 562 U.S. 86, 104, 112 [131 S.Ct. 770].)

Here, as defense counsel noted, defendant's false response to the question "[w]hat have you been arrested for" opened the door to impeach defendant's testimony about his arrests. Once defendant gave false testimony, relevant impeachment on the point was appropriate. (Evid. Code, § 780.) When introducing the felony arrests, however, the prosecutor did not reference the specific charges for which defendant was arrested, asking, "you have three felony arrests, isn't that right?" Nor did the prosecutor raise the false testimony in her closing statement, despite an extensive discussion of defendant's credibility. The arrests were not for charges similar to the charges at issue in defendant's

6

trial.[3]  And, to the extent the arrest record raised the issue of defendant's drug use, defendant had already discussed his history with drugs.  Defendant testified the charges had been dismissed or reduced to misdemeanors, diminishing the impact of the admissions.  He further explained he had misunderstood defense counsel's question to be asking about his convictions, rather than his arrests, limiting the damage to his credibility from the exchange.

There were also many other, more substantive inconsistencies in defendant's testimony that placed his credibility in doubt.  For example, he testified to having at least $1,000 in cash, at least two funded bank accounts, and a storage unit with at least $6,000 in equipment in his control, but claimed he and his codefendants robbed the stores to get money to pay hotel bills.  Defendant claimed he committed the robberies so his codefendants would give him drugs, but he committed a second robbery, even though his codefendants had not given him the drugs he was promised after the first robbery.  He testified he purchased the BB gun to protect himself from a homeless man from whom he purchased drugs, but also testified he previously had bought drugs from the same man five or six times without problems.  He testified he first started using methamphetamine in 2018, but later admitted he started using methamphetamine much earlier, when he was 15 or 16 years old.

Moreover, the prosecution's key witness, R.G., was highly credible.  He had extensive experience with the firearm in question, identified the firearm by make and model at the time of the crime, and could explain what specific characteristics he used to identify it.  His testimony was largely corroborated by the surveillance video.  The jury

---

[3] For this reason, we find unpersuasive defendant's citation to *People v. Perez* (1978) 83 Cal.App.3d 718, which concluded the admission of a "recent conviction of a crime very similar in nature to that charged against defendant" could be prejudicial when assessing the adequacy of defense counsel.  (*Id.* at p. 734.)

was able to see the firearm in the surveillance video and review how defendant and the victims treated the firearm when it was revealed.  There is little to suggest the jury would have found defendant more credible or persuasive had defense counsel acted differently, and defendant has not shown defense counsel's representation was prejudicial.

DISPOSITION

The judgment is affirmed.


_____/s/_____<br>
RAYE, P. J.

We concur:


_____/s/_____
ROBIE, J.


_____/s/_____
MURRAY, J.